# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CURTIS RICHARD LEACHMAN,

      Defendant-Appellant.

UNPUBLISHED
January 13, 2015

No. 317508
Isabella Circuit Court
LC No. 2012-002187-FC

Before: TALBOT, C.J., and CAVANAGH and M. J. KELLY, JJ.

PER CURIAM.

Curtis Richard Leachman appeals as of right his jury trial conviction of second-degree murder[1] and carrying a weapon with unlawful intent.[2] Leachman was sentenced as a fourth habitual offender[3] to concurrent terms of 45 to 80 years' imprisonment for the murder conviction and 10 to 15 years' imprisonment for the weapons conviction, with 236 days' credit for both convictions. We affirm.

## I. STATEMENT OF FACTS[4]

### A. BACKGROUND

On November 9, 2012, Leachman, then 25 years old, moved into a two-bedroom apartment in Isabella County that was leased by Valerie Sprague. The building that housed the apartment had retail space on the first floor and two apartments on the second floor. The apartments were labeled apartment A and apartment B;[5] Leachman lived in apartment A.[6]

---

[1] MCL 750.317.

[2] MCL 750.226.

[3] MCL 769.12.

[4] The facts contained in this opinion were obtained from the trial transcripts. The trial took place between May 13, 2013 and May 23, 2013.

[5] The length of the hallway between apartment B and the edge of the stairwell near apartment A is 24-1/2 feet.

Leachman was permitted to rent the spare bedroom in that apartment because Sprague was injured and was temporarily unable to live there. Sprague instructed Leachman to keep the apartment clean, not to have any parties, and to stay out of her bedroom. Leachman, however, allowed his then-close friend, Brandon Harner, to live in the apartment with him and sleep in Sprague's bedroom.[7]

## B. NOVEMBER 23-24, 2012

On November 23, 2012, Harner arrived home in the early evening after spending time with a woman who he had been dating. Harner encountered Leachman outside, near the apartment. The two men returned to the apartment together and talked for about 25 minutes. Leachman told Harner about his plans for the evening, which included seeing a woman who Leachman had been dating. After they finished talking, Leachman left the apartment and did not return for several hours.

Once Leachman returned home, he and Harner remained in the apartment for some time. At approximately 10:00 p.m., Leachman and Harner heard a bang on the wall outside of his apartment. When Leachman checked to see what caused the noise, the hallway was empty, but a hole had been made in the wall to the left of the apartment's front door. Leachman grabbed a bucket of drywall from his apartment, walked down to apartment B, and asked its occupant, Reyes Hinojosa Jr., who was going to fix the hole. Hinojosa appeared intoxicated. The conversation between Leachman and Hinojosa started off calm, but then escalated. There was an exchange of words, which included obscenities, and Leachman threw down the bucket of drywall. Leachman then picked up the bucket, and returned to his apartment. The interaction with Hinojosa lasted about two minutes.

Sometime after midnight on November 24, 2012, someone pounded on the door of Leachman's apartment. Leachman answered the door, seemingly upset about the banging. Hinojosa, Tyrone Stanley, and Chino Alaniz were in the hallway.[8] Taylor Gepford and Alsina Waboose were behind them. Harner remained inside of the apartment, a couple of feet from the door. The conversation between Leachman and the three men started off calm. Leachman and Stanley then began arguing. Stanley threatened to beat up Leachman, and the two men discussed where Harner's loyalty would lie if Leachman and Stanley fought. It was Harner's impression that because Leachman allowed Harner to live in the apartment, Leachman wanted Harner to side with him. Harner, however, told Stanley and Leachman that he would not choose sides because he was friends with both of them. Gepford encouraged Leachman and Stanley to fight.[9]

[6] Apartment A has a steel front door on a wood frame with both a lock and deadbolt. The doors of both bedrooms and the bathroom in that apartment have operable locks. There is also a fire ladder that when deployed from the window of the apartment reaches far enough for a person to get within two to six feet from the ground. Apartment A's walls were adorned with graffiti. The owner of the building, Norman Curtiss, testified that he was not certain who placed the graffiti on the walls, but he believed it was the tenant.

[7] At that time, Harner had known Leachman for approximately six years.

[8] At that time, Harner and Stanley had been close friends for approximately four years.

[9] Gepford videotaped this encounter.

The conversation lasted less than five minutes and ended without a physical altercation. After Leachman closed the door, he purportedly overheard Hinojosa, Stanley, and Alaniz discussing the need to get additional people to come to the building.[10] Leachman told Harner that he was not a good friend because he would not fight for him. At that time, it was obvious to Harner that Leachman wanted to fight.

Approximately 15 minutes later, Leachman told Harner that he wanted to go to Michael and Jacob Partie's house to see Leachman's brothers, Ethan and Andrew. Leachman and Harner walked to the Parties's house, which was five minutes away, but Ethan and Andrew were not there. Leachman then attempted to recruit people to come back to his apartment because he believed that he was going to get "jumped"[11].[12] Joe Babosh agreed to return to Leachman's apartment, so Leachman, Harner, and Babosh walked back.

Harner wanted to remove himself and Babosh from the situation and discourage Leachman from pursuing a fight. As such, once they returned to the apartment, Harner lied to Babosh and told him that there were eight people interested in fighting Leachman.[13] Around 4:00 a.m., Babosh heard yelling and banging on the walls outside of Leachman's apartment. As a result, Babosh called Caleb Donley to pick him and Harner up. Donley arrived at Leachman's apartment shortly thereafter with Nicole Coan, Karena Tucker, and Stephanie Alwood. Donley and Alwood entered apartment A, and greeted Leachman, Harner, and Babosh. Alwood then went and spoke with Stanley who was standing outside of the door to apartment B. Donley stayed in apartment A and teased Leachman, Harner, and Babosh for hiding in the apartment.[14] Donley then joined Coan, Tucker, and Alwood, outside of apartment B and spoke with Stanley. Donley had been concerned that Leachman was going to get "jumped," but Stanley told him that he intended to fight Leachman one-on-one.

Over the course of the evening, people became aware of the possibility that Stanley and Leachman may fight, so there were many people congregating in the hallway between

---

[10] Other people associated with apartment B included Georgia Ramirez and Janae Hunt.

[11] According to the trial testimony, when a person is "jumped" it means that he or she is outnumbered by his or her opponents.

[12] Leachman told law enforcement that he returned to his apartment from the Parties's house on that occasion in order to protect Sprague's property.

[13] At 3:07 a.m., Leachman called Levi Doolittle and reported that seven or eight men were pounding on his door and wanted to fight him. Leachman asked Doolittle to come help because Leachman only had a couple of "girls" to help protect him. Doolittle suggested that Leachman call the police, but Leachman told him that was not an option.

[14] Donley testified that when he greeted Leachman, Leachman was wearing gloves. Kahlil Richardson testified that the week before the incident Leachman referred to black baseball gloves that he was wearing as his "assassin" gloves. Testimony was elicited at trial that the gloves that Leachman was wearing on the night of the incident were similar in appearance to the gloves described by Richardson.

apartments A and B. Leachman eventually exited his apartment and he and Stanley began exchanging words from opposite ends of the hall. The situation began to escalate, so Harner briefly went to speak with Stanley, who was near apartment B, in an effort to alleviate the tension. The exchange of negative words continued between Leachman and Stanley; Stanley being more verbal than Leachman. According to Leachman, Stanley then removed a gun that he had in his waistband and handed it to Hinojosa, who pointed it at Leachman.[15] Stanley joked with Alaniz that he needed a belt to use on Leachman, so Alaniz handed Stanley his belt.[16] Leachman then went inside of apartment A, purportedly to retrieve a knife for his protection. It was the impression of several witnesses that the confrontation was over at that time.

Within a minute, Leachman exited apartment A, passed the stairwell, and headed toward Stanley, who was by the door of apartment B. Leachman stopped approximately eight feet from Stanley and continued arguing with him. Stanley then approached Leachman and they continued to exchange words. Then Stanley (with a belt in hand), and Leachman (holding a knife) simultaneously advanced toward each other. Leachman then stabbed Stanley in his left armpit region, and also inflicted minor knife wounds to Stanley's left shoulder and left cheek.[17] Leachman reported to law enforcement that he only used light force when he stabbed Stanley in the armpit and believed that he penetrated Stanley's skin an inch to an inch and a quarter. However, the forensic pathologist who performed the autopsy testified that the wound to Stanley's armpit was over four inches deep.

After the stabbing, Leachman returned to apartment A with the bloody knife in hand. Stanley returned to apartment B and collapsed outside of the bathroom. Waboose called 911 at approximately 4:21 a.m. about 10 minutes after the stabbing.[18] Alaniz and Gepford applied pressure to Stanley's wound until Stanley stopped breathing, which was shortly before the ambulance arrived at 4:38 a.m.[19] The knife that killed Stanley was identified as a decorative knife belonging to Sprague that was one of a pair of knives that fit together and were kept on a stand in Sprague's bedroom.

---

[15] While there was testimony that Stanley had possessed an air soft gun in the past and an air soft gun was recovered from the scene, none of the witnesses corroborated Leachman's statement to law enforcement that a gun was pointed at him on the day of the incident before Stanley was stabbed.

[16] A belt belonging to Alaniz was recovered by police from the floor of Hinojosa's apartment with blood on it. Alaniz testified that he was wearing the belt the last that he recalled.

[17] Leachman reported to law enforcement that he intended to stab Stanley in the hip or thigh, but missed because Stanley "crouched over." Testimony was elicited at trial that Stanley was in a fighting stance, but not that he was "crouched over."

[18] Defense counsel did not object to the admission of the 911 tape at trial.

[19] An autopsy revealed that at the time of his death, Stanley had a blood alcohol content between .08 and .09. There was also THC and nicotine in his system.

Harner, Babosh, Alwood, Coan, Tucker, and Donley immediately left the building, and Donley drove them all to the Parties's house. Leachman arrived at the Parties's house shortly thereafter looking for Harner. Many of those at the Parties's house had become aware of the stabbing, and Leachman was told that Harner did not want to speak with him. Tucker overheard Leachman say "Where are the witnesses at? I'm going to stab them." Tucker responded by shouting to no particular person that Leachman was going to kill them. Leachman was escorted out of the house, at which time he told Jacob Partie that Stanley was hitting him with a belt, and he did not know what else to do.

## C. INVESTIGATION

After leaving the Parties's house, Leachman returned to his apartment building. The police were present. Leachman was detained without incident in a patrol car for questioning, and was transported to the police department. Leachman did not identify himself as the person who stabbed Stanley, but rather was detained because he lived in the building. While being questioned regarding what happened that evening, Leachman recommended to Officers Nathan Koutz and Dale Hawks, two of the investigating officers, that they look for a gun in apartment B. Police recovered parts of a plastic air soft gun from inside and around the building where Leachman lived. The gun had been separated into four parts and did not have an orange tip, which would alert the public that it was not a real firearm. After the incident, law enforcement also recovered a pair of gloves in front of 510 Main Street, which is situated between Leachman's apartment and the Parties's house.[20]

## II. SUFFICIENCY OF THE EVIDENCE[21]

Leachman argues on appeal that there was insufficient evidence to support his convictions. We disagree. "We review de novo a challenge to the sufficiency of the evidence."[22] "In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt."[23] "In reviewing a sufficiency argument, this Court must not interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses."[24]

---

[20] The investigation also revealed that Leachman had two cell phones on the day of the incident and both were found in his apartment. One of the phones, which was a Motorola, was unable to make telephone calls because it was not connected to a service provider. The other phone, a Samsung, was a pre-paid cell phone that was connected to a service provider and could make telephone calls.

[21] Leachman also seemingly makes an argument regarding the sufficiency of the evidence in his Standard 4 Brief, which we also considered.

[22] *People v Henry (After Remand)*, 305 Mich App 127, 142; 854 NW2d 114 (2014).

[23] *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014).

[24] *People v Stiller*, 242 Mich App 38, 42; 617 NW2d 697 (2000).

Leachman was convicted of second-degree murder.[25]  "The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse."[26]  "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful[l] disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm."[27]  "[T]he mens rea for second-degree murder does not mandate a finding of specific intent to harm or kill.  The intent to do an act in obvious disregard of life-endangering consequences is a malicious intent."[28]

The evidence in the instant case shows that Stanley was killed by Leachman after being purposefully stabbed with a knife, which shows both "the intent to cause great bodily harm" and "the intent to do an act in wanton and willful[l] disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm."[29]  Thus, the first three elements of second-degree murder are satisfied.  Leachman, however, asserts that the killing occurred in self-defense.  "[T]he prosecution bears the burden of disproving the common law defense of self-defense beyond a reasonable doubt."[30]  As a result, "once the defendant injects the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution bears the burden of proof to exclude the possibility that the killing was done in self-defense . . . ."[31]

> [T]he killing of another person is justifiable homicide if, under all the circumstances, the defendant honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force.  As part and parcel of the "necessity" requirement that inheres in every claim of lawful self-defense, evidence that a defendant could have safely avoided using deadly force is normally relevant in determining whether it was reasonably necessary for him to kill his assailant.[32]

"[O]ne who is within his dwelling [is permitted] to exercise deadly force even if an avenue of safe retreat is available, as long as it is otherwise reasonably necessary to exercise deadly force."[33]  "[T]he duty to retreat before using deadly force is [also] not required if an individual is

---

[25] MCL 750.317.

[26] *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998).

[27] *Id*. at 464.

[28] *Id*. at 466 (citations omitted).

[29] *Id*. at 464.

[30] *People v Dupree*, 486 Mich 693, 709; 788 NW2d 399 (2010).

[31] *Id*. at 709-710 (citations and internal quotation marks omitted).

[32] *People v Riddle*, 467 Mich 116, 142; 649 NW2d 30 (2002) (emphasis omitted).

[33] *Id*.

-6-

. . . within the curtilage of that dwelling."[34]  Curtilage in the instant case was defined as "a space necessary and convenient and habitually used for family purposes."

Here, based on the trial testimony, before the stabbing, there was a hole made in the wall outside Leachman's apartment by an unknown individual; Stanley came to Leachman's house and indicated that he wanted to fight him; and there were subsequent instances of banging on the wall outside of Leachman's apartment.  While there was also testimony elicited at trial that Leachman reported to law enforcement after the incident that Stanley threatened to beat Leachman to death with a belt and also pointed a gun at him before the stabbing occurred, that information was not corroborated by any of the lay witnesses who testified.  Rather, the lay witnesses testified that before the stabbing and after seeing Stanley with a belt, Leachman returned to the safety of his apartment.  Instead of choosing to call the police or exit the building using either the fire ladder in his apartment or the stairs, which were unobstructed, Leachman retrieved a knife, exited his apartment, and approached Stanley in the hallway between apartments A and B.  This Court will not "interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses."[35]  Therefore, there was sufficient evidence for the jury to find beyond a reasonable doubt that Leachman did not honestly and reasonably believe that he was in imminent danger of death or great bodily harm warranting his use of deadly force, and was instead guilty of second-degree murder.[36]

Leachman also argues that he had no duty to retreat.  While a person has no duty to retreat from his home or the curtilage of such home,[37] the record evidence supports that Leachman left his home and arguably the curtilage of that home in order to stab Stanley.  Therefore, even considering that Leachman had no duty to retreat, sufficient evidence still exists to support his conviction of second-degree murder.

Leachman was also convicted of carrying a weapon with unlawful intent,[38] which requires that the prosecution prove that Leachman was "(1) carrying a firearm or dangerous weapon, (2) with the intent to unlawfully use the weapon against another person."[39]  It is undisputed that the knife used to kill Stanley was a dangerous weapon.  Additionally, as explained above, the evidence also supports that Leachman carried the knife with the intent to commit second-degree murder.  Accordingly, reversal of Leachman's convictions is not warranted.

---

[34] *People v Richardson*, 490 Mich 115, 132; 803 NW2d 302 (2011), quoting MCL 768.21c (quotations and emphasis omitted).

[35] *Stiller*, 242 Mich App at 42.

[36] *Goecke*, 457 Mich at 463-464; *Riddle*, 467 Mich at 142.

[37] *Riddle*, 467 Mich at 142; *Richardson*, 490 Mich at 132.

[38] MCL 750.226.

[39] *People v Mitchell*, 301 Mich App 282, 292; 835 NW2d 615 (2013) (citation, quotations, and emphasis omitted).

### III. GREAT WEIGHT OF THE EVIDENCE

Leachman next contends that the verdict was against the great weight of the evidence. We disagree. This issue is preserved.[40] As such, "[w]e review for an abuse of discretion a trial court's grant or denial of a new trial on the ground that the verdict was against the great weight of the evidence."[41]

> A trial court may grant a motion for a new trial based on the great weight of the evidence only if the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial. Absent exceptional circumstances, issues of witness credibility are for the trier of fact. The hurdle that a judge must clear in order to overrule a jury and grant a new trial "is unquestionably among the highest in our law."[42]

After reviewing the record evidence, we cannot say that the evidence in the instant case "preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand."[43] Therefore, Leachman's convictions were not against the great weight of the evidence, and there was no abuse of discretion by the trial court in denying Leachman's motion for a new trial on this ground.

### IV. JURY INSTRUCTIONS

Leachman also claims that he was denied a fair trial because the jury was improperly instructed. We disagree. This Court reviews claims "of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion."[44] Here, Leachman "bears the burden of establishing that the asserted instructional error resulted in a miscarriage of justice."[45]

Leachman argues that the jury was improperly instructed regarding the definition of curtilage. Specifically, Leachman claims that his definition of curtilage should have been used in the jury instructions because whether a certain area is curtilage is a question of law.[46] *People v*

---

[40] *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008).

[41] *Id.*

[42] *Id.* (citations omitted).

[43] *Id.*

[44] *Dupree*, 486 Mich at 702.

[45] *Id.*

[46] Leachman requested that the court instruct the jury that, "For purposes of this case, the hallway outside the defendant's apartment is to be considered part of his home."

*Killebrew*,[47] which is cited by Leachman, does not specifically discuss curtilage. Rather, the *Killebrew* Court notes that occupants of two apartments sharing a hallway, "entry to which was limited by right to the occupants," have a reasonable expectation of privacy in that hallway.[48] Thus, seizure of evidence from the hallway "was not justified by the plain view doctrine."[49] Even assuming arguendo that *Killebrew* was attempting to define curtilage, entry to the hallway in the instant case was not limited by right to the occupants of apartments A and B. Therefore, *Killebrew* is inapplicable to this case. As Leachman has failed to demonstrate that whether an area is curtilage is a question of law, we find that the trial court defining curtilage in a way that could encompass the hallway outside of Leachman's apartment did not constitute instructional error.

## V. OPINION TESTIMONY

Leachman claims that the trial court prevented him from raising a defense when it ruled that if Leachman admitted evidence of the aggressive nature of Stanley, then the prosecution could admit evidence of the aggressive nature of Leachman. We disagree. "A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion."[50] "The trial court abuses its discretion when its outcome falls outside the range of principled outcomes."[51]

The trial court relied on its interpretation of MRE 404 and MRE 405 in making the challenged ruling. MRE 404 states in pertinent part:

(a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same; or if evidence of a trait of character of the alleged victim of the crime is offered by the accused and admitted under subdivision (a)(2), evidence of a trait of character for aggression of the accused offered by the prosecution;

(2) Character of alleged victim of homicide. When self-defense is an issue in a charge of homicide, evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused, or evidence offered by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged

---

[47] 76 Mich App 215, 218; 256 NW2d 581 (1977).

[48] *Id.*

[49] *Id.*

[50] *People v Werner*, 254 Mich App 528, 538; 659 NW2d 688 (2002).

[51] *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014).

-9-

victim offered by the prosecution in a charge of homicide to rebut evidence that the alleged victim was the first aggressor;

MRE 405 further states in relevant part:

(a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct.

This Court's reading of the applicable evidentiary rules[52] supports the trial court's finding that when self-defense is an issue in a homicide case, if evidence of a trait of aggressiveness of the alleged victim of the crime is offered by the defendant, then evidence of a trait of aggressiveness of the defendant can be offered by the prosecution. Thus, there was no abuse of discretion by the trial court.

Additionally, even if the trial court's ruling was incorrect, "[t]he victim's character is not an essential element of defendant's self-defense claim."[53] Thus, Leachman's argument that he was prevented from raising a defense must fail.

## VI. EXPERTS

Leachman next claims that he was prevented from raising a defense when the trial court refused to allow funds for a psychological expert and a mechanical engineer. We disagree. "This Court reviews for abuse of discretion a trial court's decision whether to grant an indigent defendant's motion for the appointment of an expert witness."[54]

Payment for an expert witness is authorized,

provided that an indigent defendant is able to show "that there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot safely proceed to trial . . . ." If the defendant makes this showing, the judge, "in his discretion," may grant funds for the retention of an expert witness. A trial court is not compelled to provide funds for the appointment of an expert on demand.

To obtain appointment of an expert, an indigent defendant must demonstrate a nexus between the facts of the case and the need for an expert. It is not enough for the defendant to show a mere possibility of assistance from the requested expert. Without an indication that expert testimony would likely

---

[52] MRE 404 and 405.

[53] *People v Orlewicz,* 293 Mich App 96, 104; 809 NW2d 194 (2011).

[54] *People v Carnicom,* 272 Mich App 614, 616; 727 NW2d 399 (2006).

benefit the defense, a trial court does not abuse its discretion in denying a defendant's motion for appointment of an expert witness.[55]

Leachman requested funds for a psychological expert to provide an opinion regarding the stress that he was under on the day of the incident and what a reasonable person would do under the circumstances of this case. The trial court found that pursuant to *People v Shadideh*,[56] it was necessary for Leachman to first file a notice of insanity, regardless of whether an insanity defense was actually asserted, so that a forensic examination could be conducted. The court indicated that an examination by an independent psychological expert could then be requested. Leachman also requested funds for a mechanical engineer to testify regarding the amount of force necessary to break down the door of Leachman's apartment, and whether Stanley and his friends could have done so. The court requested that the factual record be developed more in this regard at the preliminary examination and advised defense counsel that the issue could then be revisited.

Here, there was no abuse of discretion by the trial court in denying Leachman's request for funds for either expert because Leachman failed to show "that there [was] a material witness in his favor within the jurisdiction of the court, without whose testimony he [could not] safely proceed to trial . . . ."[57] Also, Leachman failed to make the requests for experts for a second time after forensic or preliminary examinations were completed, which we find constitutes a waiver of the issue on appeal.[58] That notwithstanding, the record evidence demonstrates that Leachman was able to raise the issue of self-defense. As such, his argument that he was prevented from presenting a defense must fail.

## VII.  MOTIONS FOR A DIRECTED VERDICT AND FOR A NEW TRIAL

Because we have found that the above arguments do not warrant reversal, Leachman's assertion that the same grounds support a finding that the trial court erred in denying his motions for a directed verdict and for a new trial lack merit.

## VIII.  PROSECUTORIAL MISCONDUCT

Leachman claims that several instances of prosecutorial misconduct denied him a fair trial. We are not persuaded by any of Leachman's claims. "Unpreserved claims of prosecutorial misconduct . . . are reviewed for plain error."[59] "In order to avoid forfeiture of an unpreserved claim, the defendant must demonstrate plain error that was outcome determinative. 'No error

---

[55] *Id*. at 617 (citations omitted).

[56] 482 Mich 1156; 758 NW2d 536 (2008).

[57] *Carnicom*, 272 Mich App at 617.

[58] *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) ("Waiver has been defined as the intentional relinquishment or abandonment of a known right.").

[59] *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

requiring reversal will be found if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction.' "[60]

Leachman asserts that many comments by the prosecution were irrelevant and highly prejudicial. Leachman challenges the following actions of the prosecution: (1) a hypothetical question to a prospective juror during voir dire regarding how the juror would respond to law enforcement if the juror was accused of a crime; (2) the admission of the 911 call; (3) information from Sprague that Leachman was not permitted to go into her bedroom or know the decorative knife that killed Stanley was a knife unless he inappropriately inspected it; (4) some of the questions asked of Deputy Todd Graham regarding whether Leachman gave him certain information; (5) using a hypothetical about a mutual fight; and (6) asking Officer Koutz whether Leachman mentioned certain things during a brief statement made to the officer. We find that all of the above statements were relevant to the prosecution's theory of the case or Leachman's claim of self-defense and were not unduly prejudicial.[61] Even assuming for the sake of argument that the above are irrelevant, Leachman has failed to demonstrate that the above comments made by the prosecution, either individually or cumulatively, affected the outcome of the proceedings. Additionally, Leachman failed to object to the admission of the 911 tape. "Failure to object at trial to the admission of evidence constitutes a waiver of the appellate challenge to the evidence."[62] Thus, there was no error by the prosecution.

Leachman also asserts that the prosecution argued facts not in evidence when it indicated that the air soft gun that was recovered from the scene weighed between three and five pounds, and thus could not have been held up by Stanley's clothing. As aptly noted by the prosecution, the four parts of the air soft gun were admitted as evidence at trial and each of the jurors were permitted to examine such evidence. As a result, information regarding the weight of the gun was in evidence, and Leachman has not shown that the prosecution's estimate regarding the weight of the gun was inaccurate. Leachman further claims that the prosecution argued facts not in evidence when it noted that not all photographs from the scene were introduced at trial and while defense counsel could have admitted them, he did not. Read in context, the prosecution's argument made during rebuttal was seemingly in response to defense counsel implying during his closing argument that the prosecution withheld photographic evidence. Thus, the statement was proper.[63]

Leachman further challenges several statements made by the prosecution during its opening statement and claims that the prosecution misstated the law. The jury was instructed that the opening statements of the attorneys were not evidence. Additionally, the jurors were

---

[60] *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001) (citation omitted).

[61] See MRE 402 and 403.

[62] *People v McMaster*, 154 Mich App 564, 567; 398 NW2d 469 (1986).

[63] See *Watson*, 245 Mich App at 593.

appropriately instructed on the law. As "[j]urors are presumed to follow their instructions, and instructions are presumed to cure most errors,"[64] reversal is not warranted.[65]

## IX. STANDARD 4 BRIEF

Leachman also raises issues of prosecutorial misconduct and ineffective assistance of counsel in a brief filed pursuant to Administrative Order No. 2006-4, Standard 4 ("Standard 4 Brief"). We find that none of these arguments have merit.

## A. PROSECUTORIAL MISCONDUCT

Most of Leachman's claims of prosecutorial misconduct made in his Standard 4 Brief are unpreserved. Unpreserved issues of prosecutorial misconduct are reviewed for plain error affecting Leachman's substantial rights.[66] However, "[w]here issues of prosecutorial misconduct are preserved, we review them de novo to determine if the defendant was denied a fair and impartial trial."[67]

First, Leachman claims that the prosecution made numerous improper remarks during questioning, which argued facts not in evidence. Leachman challenges the following questions by the prosecution: (1) the question to Officer Brandon Talty regarding whether the officer knew if the air soft gun was recovered from the scene because "somebody who is fearful of retaliation from Native Americans" carried and dropped it; (2) the question to Officer Jonathan Straus regarding how easy it is to dismantle an air soft gun and whether it could be accomplished quickly; (3) the question to Officer Jeff Browne regarding how Leachman would expect the officer to have located the gun if Leachman did not know where the gun was; and (4) the prosecution asking one of the witnesses whether they saw a gun "Be it real, toy, imaginary or, well, you wouldn't see an imaginary one, but fake?" Leachman further asserts that many statements made by the prosecution during his closing argument also argued facts not in evidence. "Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence."[68] A review of the record evidence reveals, that the above challenged questions and statements did not argue facts not in evidence. Rather, they properly addressed the reasonable inferences arising from the evidence previously admitted at trial.

---

[64] *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

[65] Leachman also claims that trial counsel was ineffective for failing to object to the prosecution's alleged improper statements. Since we found that none of the statements made by the prosecution constituted error, and trial counsel is not ineffective for failing to raise a meritless objection, this argument must fail. *Matuszak*, 263 Mich App at 58.

[66] *Id*. at 48.

[67] *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004).

[68] *Watson*, 245 Mich App at 588.

-13-

Second, Leachman claims that the prosecution elicited irrelevant and prejudicial information. The prosecution's question to various witnesses regarding whether Leachman warned Stanley that he had a knife, as well as eliciting testimony that Leachman referred to his gloves as his "assassin gloves" were relevant to the prosecution's theory of the case and Leachman's assertion of self-defense. Moreover, outside of the testimony being unfavorable to Leachman's position at trial, Leachman has failed to demonstrate how such questions were more prejudicial than probative. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."[69] Leachman also challenges as irrelevant the prosecution noting during its opening statement that Leachman advised Doolittle that he did not want to call the police because he was a criminal. The prosecution's statement, however, was a proper representation of the evidence later presented at trial.[70] Finally, regarding the photographic evidence of the graffiti on the walls of Leachman's apartment, pictures of the layout of Leachman's apartment were relevant to Leachman's claim of self-defense. Accordingly, relief is not warranted.

Third, Leachman asserts that the prosecution improperly expressed an opinion regarding Babosh's credibility. "[A] prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness."[71] Here, the prosecution did not imply that it had special knowledge of Babosh's credibility. Rather, the prosecution asserted that based on the fact that Babosh was an uncooperative witness and his trial testimony conflicted in part with information that he provided to law enforcement, it is unclear whether his testimony was truthful. Therefore, there was no error.

Finally, Leachman argues that the prosecution's rebuttal argument inappropriately went outside of the scope of the defense's closing argument when it mentioned Doolittle.[72] The prosecution admitted during its rebuttal that it did not originally mention Doolittle in its closing argument. The prosecution's comments, however, did not exceed the scope of defense counsel's closing argument as the prosecution was responding to defense counsel's assertion that Leachman was acting in self-defense by highlighting that it was suggested to Leachman before the stabbing that he had the option of calling the police. Based on the above, there was no prosecutorial misconduct.[73]

---

[69] *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009) (citation and quotations omitted).

[70] See *People v Moss*, 70 Mich App 18, 32; 245 NW2d 389 (1976).

[71] *Thomas*, 260 Mich App at 455.

[72] This issue is preserved.

[73] Leachman again claims that trial counsel was ineffective for failing to object to the prosecution's alleged improper statements. Since we found that none of the statements made by

-14-

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Leachman made some of the arguments regarding ineffective assistance of counsel in his motion for a new trial. Thus, we will treat this issue as preserved. "However, because the trial court did not hold an evidentiary hearing, our review is limited to the facts on the record."[74] To establish a claim of ineffective assistance, Leachman must show:

> (1) that counsel's performance was deficient in that it fell below an objective standard of professional reasonableness and (2) that there is a reasonable probability that the outcome of the trial would have been different but for counsel's performance. There is a presumption of effective assistance of counsel, and the burden is on defendant to prove otherwise. An appellate court should neither substitute [its] judgment for that of counsel on matters of trial strategy, nor . . . use the benefit of hindsight when assessing counsel's competence.[75]

Leachman argues that trial counsel ineffectively cross-examined Alaniz when he failed to show him and question him regarding pictures of the air soft gun found at the scene. Leachman claims that if Alaniz had seen the pictures of the gun and testified that it was similar to Stanley's, then it would have corroborated Leachman's statement that Stanley had a gun on the day of the incident. The presence of the air soft gun in general, however, corroborated Leachman's statement. Additionally, Leachman has not demonstrated how Alaniz possibly identifying the gun as one similar to Stanley's, while also testifying that he did not see Stanley with a gun the day of the incident, would have resulted in his acquittal.

Leachman also claims that trial counsel should have recalled Lieutenant Scott Hrcka to testify after Detective Don Sytsema to show that Detective Sytsema was not as knowledgeable about fingerprinting as he claimed to be. Leachman further asserts that trial counsel should have asked additional questions of Lieutenant Hrcka, Detective Sytsema, Officer Hawks, Officer Talty, and Hinojosa on cross-examination. The order of witnesses and what questions to ask them are matters of trial strategy, and we will not "use the benefit of hindsight when assessing counsel's competence."[76]

Leachman next asserts that trial counsel was ineffective for failing to object to certain "damaging" evidence. Leachman, however, fails to state on what grounds such evidence should have been objected to. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis

---

the prosecution warrant reversal, and trial counsel is not ineffective for failing to raise a meritless objection, this argument must fail. *Matuszak*, 263 Mich App at 58.

[74] *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000).

[75] *People v Roscoe*, 303 Mich App 633, 643-644; 846 NW2d 402 (2014) (citations and quotations omitted).

[76] *Id*. at 644.

for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."[77]

Leachman also argues that an intact air soft gun of the same model as the one recovered from the scene should have been entered into evidence by trial counsel. Leachman again has not shown how admission of such evidence would have resulted in his acquittal.

Finally, Leachman states that trial counsel was ineffective because counsel admitted that he was ineffective. Trial counsel indicated at the hearing on Leachman's motion for a new trial and sentencing on July 19, 2013, that he was ineffective for not revisiting his request for a mechanical engineer after the preliminary examination. Based on the record evidence, at the time Stanley was stabbed, Leachman had left the safety of his apartment and approached Stanley in the hallway. Thus, Leachman is unable to "demonstrate a nexus between the facts of the case and the need for an expert" to testify regarding whether Leachman's apartment door could have been broken down by Stanley and his friends.[78] At the hearing on Leachman's motion for a new trial, the court implied that based on the above evidence elicited at trial, a second request for funding for a mechanical engineer would have been denied. As counsel is not ineffective for failing to advance a meritless position, relief is not warranted.[79]

Trial counsel also indicated at the hearing on Leachman's motion for a new trial that he was ineffective for failing to retain a psychological expert. Leachman claims that a psychological expert could have testified regarding how a reasonable person would have responded under the circumstances of this case. "In general, the failure to call a witness can constitute ineffective assistance of counsel only when it 'deprives the defendant of a substantial defense.'"[80] Here, Leachman pursued a self-defense theory. Additionally, Leachman has failed to show that a psychological expert being called would have resulted in his acquittal. Accordingly, trial counsel was not ineffective.

Affirmed.

/s/ Michael J. Talbot
/s/ Mark J. Cavanagh
/s/ Michael J. Kelly

---

[77] *Waclawski*, 286 Mich App at 679 (citation and quotations omitted).

[78] *Carnicom*, 272 Mich App at 617.

[79] *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

[80] *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009) (citation omitted).