PEOPLE v STILLER

Docket No. 209844, 210864. Submitted April 11, 2000, at Grand Rapids. Decided July 25, 2000, at 9:05 A.M.

Ernest W. Stiller, a physician licensed to practice medicine in Indiana, was convicted by a jury in the Berrien Circuit Court, John T. Hammond, J., of second-degree murder and unauthorized practice of medicine and was sentenced to concurrent prison terms of eight to twenty years and two to four years respectively. The charges arose out of the death of a thirty-five-year-old woman that the defendant had treated for a number of years. An autopsy performed on the woman approximately nineteen hours after her death revealed that her blood contained high concentrations of three drugs: hydrocodone, a schedule three narcotic painkiller similar to codeine; Prozac, a prescription antidepressant; and Benadryl, an antihistamine. The forensic pathologist who had performed the autopsy opined that death resulted from drug intoxication caused by the interaction of the three drugs. The prosecution produced evidence that the defendant in the month before the decedent's death had given the decedent a number of prescriptions for hydrocodone that had allowed the decedent to obtain hydrocodone in amounts far in excess of any bona fide therapeutic purpose and that this had been done despite the fact that the defendant had been cautioned by an area pharmacist regarding his large prescriptions of hydrocodone. A medical expert testified that the defendant's prescription rate for the decedent created a high probability of great bodily harm or the potentiality of death. There was evidence that the defendant treated the decedent at her apartment on two different occasions on the day of her death. The defendant presented expert witnesses who testified that a medical phenomenon known as postmortem redistribution had caused the drug levels in the decedent's blood at the time of the autopsy to be much higher than the levels in her blood before death. The defendant appealed, raising issues related to the sufficiency and weight of the evidence with respect to both convictions and with respect to the admissibility of testimony concerning the drug levels found in the blood samples taken at the autopsy. (Docket No. 210864.) The prosecution appealed, challenging the sentence imposed with respect to the conviction of second-

degree murder. (Docket No. 209844.) The appeals were consolidated.

The Court of Appeals *held:*

1. There was sufficient evidence presented at trial from which the jury could conclude that the decedent died from drug intoxication. There was also sufficient evidence presented to establish that the defendant acted in a manner that exhibited a wanton and wilful disregard of the likelihood that the natural tendency of his behavior was to cause fatal drug intoxication. Thus, there was sufficient evidence for the jury to find that the defendant caused the death of the decedent and for the jury to infer that the defendant's behavior evidenced malice. Accordingly, there was sufficient evidence presented to support a conviction of second-degree murder. Because there was no evidence suggesting that death resulted from the decedent attempting to commit suicide, the question whether the defendant was guilty of second-degree murder was properly submitted to the jury.

2. Because it was uncontroverted that the defendant did not possess a valid medical license in Michigan at any time pertinent to this matter, and because there was testimony by a number of witnesses that the defendant on numerous occasions practiced medicine at his home in Three Oaks, Michigan, there was sufficient evidence to support a conviction of the unauthorized practice of medicine. The provision in MCL 333.16171(h); MSA 14.15(16171)(h) that exempts from the Michigan medical licensing requirement a person who is licensed to practice medicine in an adjoining state but that specifically limits that exemption to a person who does not maintain an office or designate a place to meet patients or receive calls in this state is inapplicable in this case, because it is clear that the defendant regularly treated patients at his house in this state.

3. The evidence, viewed in its entirety, supported the jury's finding that the decedent's death was the result of the defendant's actions, that the defendant's actions displayed a wilful and wanton disregard for the natural consequences, and, thus, that the defendant was guilty of second-degree murder. The conviction of second-degree murder was not against the great weight of the evidence, and the trial court did not abuse its discretion in denying the defendant's motion for a new trial with respect to that conviction.

4. The conviction of unauthorized practice of medicine was not against the great weight of the evidence. The trial court did not abuse its discretion in denying the defendant's motion for a new trial with respect to that conviction.

5. The trial court did not abuse its discretion in admitting the testimony of the pathologist relative to the drug concentrations found in the samples of the decedent's blood taken during the autopsy. The testimony concerning the possibility that postmortem redistribution caused the drug levels at the time of the autopsy to differ from the levels that would have been found at the time of the decedent's death was relevant to the weight to be afforded the evidence, not the admissibility of the evidence. The jury was adequately informed of the possible ramifications of postmortem redistribution.

6. The trial court did not abuse its discretion in referring to the sentencing guideline range for manslaughter rather than using the guideline range for second-degree murder upon its determining that there should be a downward departure in the sentence imposed. The court clearly stated its belief that there should be a downward departure and articulated reasons for that belief. The court recognized the need to use the sentencing guidelines, but, in the exercise of its sentencing discretion, decided that the individualized circumstances of this case made the guideline's range for manslaughter more appropriate than the range for second-degree murder.

Affirmed.

CRIMINAL LAW — MALICE — INFERENCES — SECOND-DEGREE MURDER — PHYSICIANS — PRESCRIPTION DRUGS.

Malice can be inferred from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm; the malice necessary to sustain a physician's conviction of second-degree murder where the death of the victim results from drug intoxication can be inferred from the physician's giving the victim prescriptions for drugs in quantities having no rational relationship to a bona fide therapeutic purpose under the circumstances if there is a probability of great bodily harm resulting from the victim's use of the prescribed drugs in the quantities prescribed.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *James Cherry*, Prosecuting Attorney, and *Michael J. Sepic* and *Aaron J. Mead*, Assistant Prosecuting Attorneys, for the people.

State Appellate Defender (by *Peter Jon Van Hoek*), for the defendant on appeal.

Before: METER, P.J., and FITZGERALD and O'CONNELL, JJ.

METER, P.J. In Docket No. 210864, defendant appeals as of right from his conviction by a jury of second-degree murder, MCL 750.317; MSA 28.549, and unauthorized practice of medicine, MCL 333.16294; MSA 14.15(16294). The trial court sentenced him to concurrent terms of eight to twenty years' imprisonment for the second-degree murder conviction and two to four years' imprisonment for the unauthorized practice of medicine conviction. In Docket No. 209844, the prosecutor appeals as of right, challenging the second-degree murder sentence. We affirm.

### FACTUAL BACKGROUND

This case involves the death of Loretta Sloan, a thirty-five-year-old woman who, on the evening of February 4, 1997, was taken from her apartment to the hospital and pronounced dead shortly thereafter. Defendant had treated Sloan for years and had spent much of February 4 at her apartment treating her for what he described as flu symptoms. Dr. Stephen Cohle, a forensic pathologist, performed an autopsy on Sloan approximately nineteen hours after her death and found the following drugs in her blood: hydrocodone (a painkiller similar to codeine), at a concentration of 146 nanograms a milliliter (ng/ml); Prozac (an antidepressant), at 930 ng/ml; and Benadryl (an antihistamine), at 3,000 ng/ml. Cohle attributed Sloan's death to mixed-drug intoxication. Defendant's experts contended that because of a medical phenomenon called "postmortem redistribution," the drug level in Sloan's blood at the autopsy was

much higher than that actually present in her blood before death. Consequently, they did not believe that she died of drug intoxication. Additionally, defendant contended that he did not have the requisite state of mind to be convicted of murdering Sloan.

## SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the prosecutor presented insufficient evidence to support the convictions. We disagree. In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Johnson*, 460 Mich 720, 723; 597 NW2d 73 (1999). In reviewing a sufficiency argument, this Court must not interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).

Examining first the validity of defendant's second-degree murder conviction, we conclude, contrary to defendant's argument on appeal, that sufficient evidence existed to support the conclusion that Sloan died of mixed-drug intoxication. Dr. Cohle so testified, and, although defense experts contradicted this conclusion and argued that postmortem redistribution rendered the concentration of drugs in her body at the time of death indeterminable, these arguments were relevant to the weight—not the sufficiency—of the evidence.

The next question is whether the evidence supported a finding that defendant caused this fatal mixed-drug intoxication with "malice." *People v Hopson*, 178 Mich App 406, 410; 444 NW2d 167 (1989). Malice is defined, inter alia, as a defendant's wanton and wilful disregard of the likelihood that the natural tendency of his behavior is to cause death or great bodily harm. *Id.*; see also *People v Bailey*, 451 Mich 657, 669; 549 NW2d 325 (1996), amended 453 Mich 1204 (1996), and *People v Aaron*, 409 Mich 672, 728; 299 NW2d 304 (1980). "Malice can be inferred from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Djordjevic*, 230 Mich App 459, 462; 584 NW2d 610 (1998).

Evidence that defendant exhibited a wanton and wilful disregard of the likelihood that the natural tendency of his behavior would be to cause a fatal mixed-drug intoxication may be gleaned from a number of facts. First, it is uncontroverted that during the four months immediately preceding Sloan's death, defendant prescribed hydrocodone, a schedule three narcotic not intended for long-term use, for Sloan in very large quantities having no rational relationship to a bona fide therapeutic purpose. Furthermore, an area pharmacist testified that, on January 6, 1997, she orally cautioned defendant regarding his large prescriptions of hydrocodone and subsequently furnished him with medical literature supporting her concern, but this warning apparently did not deter defendant. Additionally, one of defendant's expert witnesses conceded that the amount of hydrocodone for which prescriptions were filled for Sloan on January 8, 9, and 10, 1997 (totaling three hundred 7.5-mg

tablets), was excessive and did not constitute good medicine. Another pharmacist cautioned defendant that the hydrocodone prescription of January 8, 1997, was an "early fill," but defendant replied that it was permissible to dispense it. In short, from January 2 through February 1, 1997, various area pharmacies filled prescriptions written or called in by defendant for Sloan totaling 750 hydrocodone tablets, equivalent to about twenty-five tablets a day during that interval; this far exceeded the recommended dosage. From this the jury could properly conclude that defendant had notice that Sloan was consuming dangerous amounts of hydrocodone but nevertheless continued to supply her with that and other medications, and that his doing so caused her demise.

Second, ten prescriptions defendant wrote for Sloan were filled in one day, January 14, 1997. Included were prescriptions for both Prozac and Eldepryl, which defendant admitted should not to be taken together. Admittedly, no Eldepryl or its metabolic products were found in Sloan's blood at the time of the autopsy, and the prosecution does not argue that Eldepryl caused Sloan's death. Nevertheless, the facts that Prozac and Eldepryl were prescribed together, that, at the time of Sloan's death, at least thirty of the Eldepryl tablets were missing from their container, and that defendant claimed he did not know where they went suggests that defendant was taking unconscionable risks with Sloan's health.

Third, one of the prosecution's experts testified regarding his concern that defendant prescribed other drugs for Sloan without any indication in her history that the drugs were needed. The testimony established that in a person like Sloan, with a history of

cardiac arrhythmia, these other medications prescribed by defendant could put her at greater risk of rapid heart rate. This evidence again tends to show that defendant was taking unconscionable risks with Sloan's well-being.

Fourth, a professor of internal medicine at the University of Michigan testified that defendant's drug prescription rate for Sloan from January 14, 1997, to the date of her death created "not just a possibility, but a probability of great bodily harm." This witness testified that "[l]ooking at [defendant's] prescription patterns, I would say that he is creating significant risk of great bodily [sic] or potentially death based upon what he has prescribed in the amounts that he has prescribed within the time frames that we're talking about."

Fifth, defendant's actions on the day of Sloan's death were suspicious. The apartment manager testified that on February 4, 1997, she went to Sloan's apartment at approximately 1:00 P.M., toward the end of her lunch hour, that she found defendant there, very agitated and sweaty, that she was told by defendant that Sloan was very ill, and that she saw defendant leave at about 1:30 P.M., returning at approximately 2:00 P.M. with what appeared to be an intravenous medicine (IV) bag. Yet defendant denied being agitated or sweaty when speaking with the witness. Defendant further indicated that he left Sloan's apartment around noon because Sloan was feeling better and that when he returned around 2:30 P.M., he did not bring an IV bag. The testimony of the apartment manager and defendant, together, corroborated defendant's culpability.

Finally, it is undisputed that defendant wrote Sloan at least two prescriptions for Benadryl between October 1, 1996, and February 4, 1997. We note that defense witnesses testified regarding an experiment conducted by defendant after his arrest in which he purposely consumed a quantity of hydrocodone and Prozac to demonstrate that the blood levels of these medications found in Sloan's body were not fatal to him. However, it is significant that, during this experiment, defendant did not take any Benadryl. Despite his explanation of why he did not do so, we agree with the prosecution that defendant's "deliberate decision not to take Benadryl in the face of the allegation that it had contributed to Sloan's death was revealing."

The totality of the evidence, when considered in the light most favorable to the prosecution, was sufficient to show that defendant had a wanton and wilful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. In *Djordjevic, supra* at 462, this Court cited *People v Baker*, 216 Mich App 687; 551 NW2d 195 (1996), reversed on other grounds sub nom *People v Goecke*, 457 Mich 442; 579 NW2d 868 (1998), as distinguishing between whether death or great bodily harm is the natural tendency of the act (second-degree murder), or whether the defendant acted in wanton disregard that death or great bodily harm may follow (involuntary manslaughter). The *Djordjevic* Court held that where an arsonist set fire to a bar using gasoline and was himself killed in the resulting conflagration,

it would not be unreasonable for a jury to conclude that defendants [who hired the arsonist] acted only in wanton

> disregard that death or great bodily harm might follow, [but] a jury could also reasonably conclude that death or great bodily harm was the natural tendency of defendants' act. A fire was set in a building with gasoline, with residences nearby. A reasonable jury could conclude that the danger to the arsonist, neighbors, or fire fighters was sufficiently high to allow for the conclusion that death or great bodily harm was the natural tendency of the act. The trial court erred in removing that determination from the province of the jury. [*Djordjevic, supra* at 463.]

Similarly, in the case at bar, the evidence created a jury-submissible question regarding defendant's guilt of second-degree murder.

Defendant contends that his murder conviction was inappropriate because there was no evidence that he actually instructed Sloan to take a fatal dose of drugs. Nevertheless, by prescribing huge quantities of medicine unrelated to any rational medical treatment and that had a possibility of interacting with other drugs he prescribed, defendant should have known that an overdose was likely to occur, and he therefore exhibited a wanton and wilful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm.

Defendant further contends that his murder conviction was inappropriate under *People v Kevorkian*, 447 Mich 436, 445; 527 NW2d 714 (1994), a case in which the Supreme Court held that a defendant may not be held liable for murder if he merely provides the means by which a person commits suicide. *Kevorkian*, however, is distinguishable from the case at bar, where defendant was not helping Sloan to commit suicide but was providing her with drugs that she apparently believed would *improve* her health. We note that there was no evidence that Sloan committed

suicide or accidentally ingested a fatal overdose of drugs; indeed, defendant claimed to be carefully monitoring Sloan's condition and spent much of February 4, 1997, with her.

We next turn to the sufficiency of the evidence regarding defendant's conviction of unauthorized practice of medicine. MCL 333.16294; MSA 14.15(16294) provides, in relevant part:

> [A]n individual who practices or holds himself . . . out as practicing a health profession regulated by this article without a license . . . is guilty of a felony.

It is uncontroverted that defendant did not possess a valid medical license in Michigan during the time at issue in this case. Furthermore, trial testimony by a number of witnesses demonstrates that defendant, on numerous occasions, practiced medicine at his home in the Three Oaks, Michigan, area. Considered in the light most favorable to the prosecution, the evidence was sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that defendant violated MCL 333.16294; MSA 14.15(16294).

Defendant, who was licensed to practice medicine in Indiana, contends that he fell within the exception contained in MCL 333.16171(h); MSA 14.15(16171)(h), which excepts the following from the Michigan licensing requirement:

> An individual residing adjacent to the land border between this state and an adjoining state who is authorized under the laws of that state to practice a health profession and whose practice may extend into this state, but who does not maintain an office or designate a place to meet patients or receive calls in this state.

Defendant, however, did not meet the requirements for this exception. He did not treat Michigan patients from across the border as part of an Indiana practice but rather treated Michigan patients who had no connection to an Indiana medical office. Moreover, a trial witness testified that defendant treated at least three patients at his Michigan home, and another witness testified that she received prescription diet pills from defendant by calling his Michigan home. Accordingly, MCL 333.16171(h); MSA 14.15(16171)(h) did not apply to this case, and defendant's conviction of unauthorized practice of medicine was supported by sufficient evidence.

## WEIGHT OF THE EVIDENCE

Next, defendant argues that the trial court erred in denying his motion for a new trial based on the great weight of the evidence. We review for an abuse of discretion a trial court's determination that a verdict was not against the great weight of the evidence. *People v Gadomski*, 232 Mich App 24, 27-28, 592 NW2d 75 (1998). "An abuse of discretion will be found only where the trial court's denial of the motion was manifestly against the clear weight of the evidence." *People v Daoust*, 228 Mich App 1, 16; 577 NW2d 179 (1998).

Defendant contends that the evidence heavily preponderated against a finding that Sloan died of drug intoxication. Specifically, defendant contends that because the physician who performed the autopsy drew blood only from an area near the heart, and because the drug levels in that blood sample were likely distorted by postmortem redistribution, there

was no way to know whether Sloan had indeed ingested a lethal dose of drugs.

The testimony regarding Sloan's cause of death was as follows. The pathologist, Dr. Cohle, testified that he drew blood from Sloan's right subclavian vein, approximately six or seven inches from her heart, approximately nineteen hours after her death. He found a level of hydrocodone that was within the low end of the lethal range for that drug, a level of Prozac that was not within the lethal range, and a level of Benadryl that was within the toxic level but not within the lethal range. Based on Sloan's relatively young age and the absence of injury, disease, or any other cause of death, Cohle believed that Sloan died because of an interaction among the three drugs. In giving his opinion that the three drugs were responsible for her death, Cohle stated: "I'm not claiming that I know exactly how it happened. I'm saying . . . all three [were] significantly elevated and . . . there's no other cause of death." Cohle further stated that even if the number of pills represented by the drug concentrations in Sloan's body at the time of the autopsy were within the therapeutic range, he would not change his opinion regarding the cause of death. A later prosecution witness, however, testified that if the three drugs were taken in therapeutic amounts, their combination would not pose a problem.

Cohle admitted that he did not know to what degree any postmortem redistribution might have occurred in Sloan's body. He admitted being aware of an article indicating that blood concentrations of certain drugs are usually greater when taken from the subclavian vein as opposed to veins further from the

heart. Cohle did not believe, however, that there was any significant redistribution effect in Sloan.

Benedict Kuslikis, an analytical toxicologist, testified that Prozac, Benadryl, and hydrocodone were subject to postmortem redistribution, but he did not know exactly to what extent they redistributed. He agreed, however, that Benadryl could redistribute by as much as twenty-one times and Prozac by five, six, or even eleven times.

Dr. Bernard Eisenga, a medical toxicologist, testified that he knew of one published case in which a hydrocodone level of 130 ng/ml at the time of autopsy was lethal, although he did not know whether the 130 ng/ml was for heart blood or peripheral blood. Eisenga further indicated that he knew of one case where a postmortem Benadryl level was lower in the subclavian vein than in the femoral vein (an area further from the heart).

Graham Jones, a forensic toxicologist, testified that Prozac, Benadryl, and drugs related to hydrocodone were known to redistribute. Jones believed that the autopsy drug levels found in Sloan were not representative of the levels at the time of death. He testified that the hydrocodone likely redistributed by two to five or six times and the Benadryl by two to five times, or possibly more. Jones believed that after compensating for redistribution, he "would not feel comfortable in saying that that combination of drugs in combination or singly would be sufficient to cause death."

William Anderson, another toxicologist, testified that all three drugs found in Sloan's body were subject to redistribution and that he could therefore not say whether Sloan died from a drug overdose. Dr.

Miles Jones, a forensic examiner, concurred in this statement, indicating that Sloan's death should be classified as "undetermined."

Viewing this evidence in its entirety, we cannot say that the trial court abused its discretion in denying defendant's motion for a new trial. As stated in *People v Lemmon*, 456 Mich 625, 644; 576 NW2d 129 (1998), quoting *State v Kringstad*, 353 NW2d 302, 307 (ND, 1984): "If the 'evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions,' the judge may not disturb the jury findings although his judgment might incline him the other way." Although several witness testified that the drugs found in Sloan's body were subject to redistribution, no witness could say with certainty to what degree redistribution had occurred. Moreover, Dr. Eisenga knew of at least one published case in which a hydrocodone level of 130 ng/ml at the time of autopsy was fatal, and Dr. Cohle testified that based on the absence of any other cause of death, Sloan likely died as a result of the drugs in her system. As this Court indicated in *People v Thomas*, 85 Mich App 618, 627; 272 NW2d 157 (1978), a prosecutor need not prove with absolute certainty that a particular incident caused the victim's death; a *medical likelihood* suffices. Here, the evidence supported the jury's finding that Sloan died of drug intoxication, and the trial court therefore did not abuse its discretion in denying defendant's motion for a new trial on this basis.

Defendant additionally argues that the evidence heavily preponderated against a finding that defendant had the requisite state of mind for second-degree murder. Specifically, defendant contends that there was no evidence indicating that defendant prescribed

excessive dosages, as opposed to numbers of tablets, of the medicines that placed Sloan's life in jeopardy. However, as discussed earlier, in prescribing exceedingly large quantities of medicine that were unrelated to any therapeutic dosages and that had the possibility of interacting with other prescribed medicines, defendant did indeed exhibit a wanton and wilful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. The trial court did not abuse its discretion in denying defendant's motion for a new trial on this basis.

Defendant additionally argues that his conviction of unauthorized practice of medicine was against the great weight of the evidence. Defendant's argument in this regard parallels his argument regarding the sufficiency of the evidence, and we reject it for the same reasons we rejected defendant's sufficiency argument. The licensing exception found in MCL 333.16171(h); MSA 14.15(16171)(h) did not apply to this case, and the trial court therefore did not abuse its discretion in denying defendant's motion for a new trial with regard to the conviction of unauthorized practice of medicine.

### EXPERT TESTIMONY

Next, defendant argues that Dr. Cohle's testimony regarding the cause of Sloan's death was inadmissible because the toxicological results showing the concentration of hydrocodone, Prozac, and Benadryl in Sloan's blood at the time of the autopsy did not accurately and reliably reflect the concentration of those medications in her body at the time of death and that the trial court therefore should have ruled Cohle's testimony inadmissible under MRE 702. We disagree. We

review a trial court's decision on evidentiary matters for an abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998); *Chmielewski v Xermac, Inc*, 457 Mich 593, 614-615; 580 NW2d 817 (1998). An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say there was no justification for the ruling made. *People v Rice (On Remand)*, 235 Mich App 429, 439; 597 NW2d 843 (1999).

MRE 702 provides:

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Defendant contends that the trial court should have compelled the prosecution to correlate autopsy blood concentrations with concentrations at the time of death before allowing Cohle to testify regarding the causative effect of these drugs on Sloan's death. In support of his theory, defendant relies primarily on *Nelson v American Sterilizer Co (On Remand)*, 223 Mich App 485; 566 NW2d 671 (1997), *Amorello v Monsanto Corp*, 186 Mich App 324; 463 NW2d 487 (1990), *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and *Frye v United States*, 54 App DC 46; 293 F 1013 (1923), which was superseded as applied to federal cases as stated in *Daubert, supra* at 587.

An application of *Nelson, Amorello, Daubert,* and *Frye* to the instant case provides no basis for reversal. *Nelson, supra* at 491, indicated that MRE 702

requires a trial court to "determine the evidentiary reliability or trustworthiness of the facts and data underlying an expert's testimony before that testimony may be admitted." *Amorello, supra* at 332, indicated that "[t]he facts and data upon which [an] expert relies in formulating an opinion must be reliable." *Daubert, supra* at 592-593, indicated that an expert's reasoning and "methodology" must be scientifically valid and properly applicable to the facts at hand. *Frye, supra* at 47, indicated that scientific evidence must be generally accepted in the scientific community to be admissible.

Here, there was nothing novel, suspect, or unreliable about Cohle's testimony regarding the level of drugs in Sloan's blood at the time of the autopsy. These data were scientifically determinable. Nor was there anything novel, suspect, or unreliable about Cohle's conclusion that because of the absence of other causes of death and because of the drug levels in Sloan's body, the likely cause of death was drug intoxication. Assuming, arguendo, that postmortem redistribution affected the level of drugs found in Sloan's body at the autopsy as compared to the time of death, the effect of this redistribution was disputed at trial, and such evidence is relevant to the weight, not the admissibility, of Cohle's testimony. The jury was adequately informed of the ramifications that postmortem redistribution, according to defendant's experts, could have on a determination of the cause of Sloan's demise. No error occurred.[1]

---

[1] To the extent that defendant argues that the court erred in failing to rule on the admissibility of Dr. Cohle's testimony before his taking the stand, any error in this regard was harmless, given that the testimony was indeed admissible.

SENTENCING

Finally, the prosecution appeals defendant's sentence for second-degree murder, claiming that it was based on a local sentencing policy and failed to reflect the applicable sentencing guidelines. According to the sentencing information report, the guidelines' sentence range for defendant's second-degree murder conviction was ten to twenty-five years. The trial court sentenced defendant to a minimum term of eight years in prison, explaining its downward departure in the sentencing information report departure evaluation as follows:

> There are serious legal questions about whether or not the case should have been bound over as Murder II . . . or manslaughter. Since I was bound by the Court of Appeals decision on point, I had to bind over on Murder II . . ., though I feel the Court of Appeals decision was wrong.[2] I sentenced at the top end of the manslaughter range rather than the bottom of the Murder II . . . range [8 years rather than 10 years].

Additionally, at the sentencing proceeding, the court explained its sentence as follows:

> [T]he evidence at trial I find was sufficient to legally support [the second-degree murder verdict]. . . . But considering these factors, considering that, as the defense pointed out, both the defense attorney and Defendant, that there was no claim by anyone that the Defendant intended to kill

---

[2] In making this statement, the trial court was referring to a case, *People v Fiedler*, 194 Mich App 682; 487 NW2d 831 (1992), in which this Court held that the same trial court erred in determining the standard for a proper bindover. The trial court believed that with respect to the existence of the crime, the standard was whether the crime had been committed, not whether there was probable cause to believe that the crime had been committed. The *Fiedler* panel disagreed.

or to do great bodily harm to the deceased. That was never claimed. The Prosecutor abjured such a claim from the very beginning. But considering the possible impact of the Supreme Court decision in this case and since I am allowed to vary from the guidelines when I believe there's an appropriate basis for it . . . . I'm going to, in an effort to mitigate the problems, utilize the guideline range of manslaughter rather than murder. It doesn't make a great deal of difference. It makes two years['] worth of difference, but two years may not seem like much. Of course if it was your life two years makes a whole lot of difference.

Provided that permissible factors are considered, appellate review of a sentence is limited to whether the sentencing court abused its discretion. *People v Fetterley*, 229 Mich App 511, 525; 583 NW2d 199 (1998). A sentencing court abuses its discretion when it violates the principle of proportionality, which dictates that a sentence be proportionate to the seriousness of the crime and the defendant's prior record. *People v Milbourn*, 435 Mich 630, 635-636, 654; 461 NW2d 1 (1990). The *Milbourn* standard applies to sentences that are below the guidelines. *People v Lankey (After Remand)*, 198 Mich App 187, 188; 497 NW2d 571 (1993).

We do not agree with the prosecution that the trial court abused its discretion in fashioning defendant's sentence for second-degree murder. Initially, we note that the trial court did refer to the sentencing guidelines for second-degree murder. The trial court then essentially decided to engage in a downward departure. In using the guidelines for manslaughter as opposed to murder in engaging in the downward departure, the court was in essence determining that this case was not as serious or severe as other instances resulting in convictions under MCL 750.317;

MSA 28.549. See *People v Kowalski*, 236 Mich App 470, 474; 601 NW2d 122 (1999). We cannot say that the trial court abused its discretion in this regard. We conclude that the court did not violate MCR 6.425(D)(1), requiring the court to use the sentencing guidelines, and it properly imposed a sentence for second-degree murder that reflected the factors incorporated into the sentencing guidelines and proper departures therefrom based on the circumstances of this case. See *People v McFarlin*, 389 Mich 557, 574; 208 NW2d 504 (1973). Contrary to the prosecution's assertion, the trial court did not conform the sentence to a local sentencing policy but instead imposed an individualized sentence based on this particular defendant. See *People v Whalen*, 412 Mich 166, 169-170; 312 NW2d 638 (1981). We therefore affirm defendant's sentence for second-degree murder.

Affirmed.