*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DOMINIQUE MARTELL MOORE,

Defendant-Appellant.

UNPUBLISHED
October 27, 2022

No. 352595
Wayne Circuit Court
LC No. 19-002274-01-FC

Before: RONAYNE KRAUSE, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a jury trial, of armed robbery, MCL 750.529, assault with intent to rob while armed (AWIRWA), MCL 750.89, unlawful imprisonment, MCL 750.349b, felon in possession of a firearm, MCL 750.224f(5), felon in possession of ammunition, MCL 750.224f(6), felonious assault, MCL 750.82, possession of a short-barreled shotgun, MCL 750.224b, and five counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 20 to 35 years each for the robbery and assault-with-intent-to-rob convictions, 5 to 15 years for the unlawful-imprisonment conviction, one to five years each for the felon-in-possession and possession-of-a-shotgun convictions, and one to four years for the felonious assault conviction, to be served consecutive to concurrent two-year terms of imprisonment for the felony-firearm convictions. We vacate defendant's convictions of AWIRWA and the accompanying felony-firearm conviction, which violate defendant's right to be free from double jeopardy. In all other respects, we affirm.

## I. BASIC FACTS

Defendant's convictions arise from the February 2019 armed robbery of Tamara King in Detroit. King had been using a dating app called Skout.[1] King met defendant, who was calling himself "Mario," on the site, and the two communicated for some time. Defendant and King both

---

[1] The app also is known as MeetMe.

-1-

uploaded photographs of themselves to their respective profiles on the site. On February 7, 2019, the two exchanged phone numbers so they could communicate over the phone. King and defendant had conversations on the phone, and the two eventually met at King's house. When they first met in person, the two just sat on the couch, drank, smoked marijuana, and talked. King had no concerns about defendant at the time, and the two met again on February 10 at King's house. Defendant arrived sometime in the later evening and the two again sat, drank, smoked marijuana, and talked. Defendant left because he purportedly had to take a car seat to his sister.

Sometime after leaving, defendant called King back, saying that he wanted to return. King initially resisted because it was late, but she eventually relented. When defendant returned, he handed King a bag of chips that King had requested, and he then excused himself to use the bathroom. Several minutes later, defendant returned. King was not paying much attention before she heard the sound of a gun cocking, which made her look up. She then saw defendant wearing gloves and wielding a handgun.

Defendant asked King where the "stuff" or money was and led King around the house looking for items. When they reached King's bedroom, defendant took a Versace robe, some eyeglasses, a Rolex watch, and a white and gold diamond chain. Defendant also took the DVR box that was in King's bedroom because he noticed that there were cameras around the exterior of the house. The two went downstairs to the main level, and on the way out defendant had King grab a pair of Gucci shoes that were near the door. At gunpoint, defendant led King to a small, white car that was outside. With King in the car, defendant drove north down the street, turned left at the next street, and then stopped at the next street after that. At that point, defendant instructed King to reset her iPhone, which she did. Defendant then took the iPhone, let King out, and drove away.

Officer Timothy Nolan was the initial officer in charge. With King's consent, Officer Nolan obtained data from Skout that showed King's communication history. Officer Nolan found a series of messages with a person who had the same phone number that King had independently provided. After seeing that the number from Skout matched the number King had provided, Officer Nolan procured a search warrant for data from the cellphone carrier for that number, which permitted an analyst to create a map showing where the cellphone had been located. Officer Nolan performed a LEIN search for defendant, which revealed that "Mario" was an alias used by defendant. Officer Nolan created a photo array with defendant's photo for King to review. The array contained photos of six individuals, and King selected defendant's photo from the lineup.

An arrest team thereafter showed up at defendant's home, which had a white car parked outside, and arrested him. Defendant was arrested and placed in a police scout car. A police officer, without providing any *Miranda*[2] warnings, asked defendant if there were any guns in the house. Defendant indicated there was a shotgun in a closet. Defendant's live-in girlfriend consented to a search of the premises, and the police found a sawed-off shotgun and two magazines for a Glock handgun in a front closet. Officers also recovered a Versace robe. At trial, King

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

positively identified the robe as hers, and she noted distinguishing characteristics and stains from both makeup and bodily fluids on the robe.

At trial, the prosecution introduced evidence of defendant's cell-phone usage and cell-tower data. The data showed, among other things, that defendant's phone made calls to King's 910 number on the night of February 10 and 11 at 7:26 p.m., 7:27 p.m., 8:29 p.m., 9:44 p.m., 11:55 p.m., and 12:06 a.m.

The jury convicted defendant as previously described, but it acquitted him of Counts 11 and 14, which were felony-firearm counts related to the felon-in-possession and possession-of-a-shotgun charges, respectively.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he is entitled to a new trial because trial counsel was ineffective. We disagree.

Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant has the burden of proving otherwise. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). Generally, to establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). However, such performance must be measured without the benefit of hindsight. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

## A. FACIAL-RECOGNITION SOFTWARE

Defendant first argues that trial counsel was ineffective by failing to challenge the validity of the facial-recognition software. Defendant generally argues that facial-recognition software has been shown to be less reliable when the subject has dark skin, like defendant. While that may be true, the facial recognition software was only used to put a name to the photographs retrieved from Skout for investigatory purposes. Evidence of the facial recognition software was therefore only presented as background to how Officer Nolan ended up including a photograph of defendant in the lineup that he showed to King. Even if the facial recognition software is inherently unreliable, Officer Nolan testified that he did not suggest to King that the person who robbed her was included in the array; rather, he only asked her whether she recognized any of the people in the photos. King's selection of defendant's photograph from the array had, in short, absolutely nothing to do with the methodology used by the police to obtain that photograph. Therefore, any unreliability in the facial recognition software cannot have prevented defendant from obtaining a fair trial. See *Lisenba v California*, 314 US 219, 236-237; 62 S Ct 280; 86 L Ed 166 (1941). The jury still would have heard King's identification of defendant as the perpetrator at trial and heard her previous identification of defendant in the photo lineup, and it still would have heard the evidence linking defendant's cell phone number to the calls that were made to King's phone on the night of the offense. Challenging the facial recognition software would have gained defendant nothing in this

case,[3] and counsel cannot be ineffective for failing to undertake a futile gesture. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## B. PHOTO ARRAY

Defendant also argues that trial counsel was ineffective by withdrawing a motion for a *Wade*[4] hearing and otherwise failing to challenge King's identification of defendant in the photo lineup. In his Standard 4 brief,[5] defendant also challenges the admissibility of the photo array. For brevity, we will address both arguments at once.

The purpose of a *Wade* hearing is to inquire into whether a witness who identified a defendant at an unacceptably suggestive or otherwise improper lineup (or similar pretrial identification procedure) had some permissible independent basis to identify the defendant in the courtroom, and thereby to determine whether the identification must be excluded as evidence. See *People v Kachar*, 400 Mich 78, 91-97; 252 NW2d 807 (1977). A *Wade* hearing may also be used to inquire directly into the propriety of the lineup. See *People v Kurylczyk*, 443 Mich 289, 302-303; 505 NW2d 528 (1993); see also *People v Fordham*, 132 Mich App 70, 76; 346 NW2d 899 (1984), reversed on other grounds 419 Mich 874 (1984). Our Supreme Court has explained that:

> Generally, the photo spread is not suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features and thus sufficient to reasonably test the identification. Thus, differences in the composition of photographs, in the physical characteristics of the individuals photographed, or in the clothing worn by a defendant and the others pictured in a photographic lineup have been found not to render a lineup impermissibly suggestive. [*Kurylczyk*, 443 Mich at 304-305 (quotation marks and citations omitted).]

An array will typically be impermissibly suggestive, meaning the "identification of a defendant was the product of an improper photographic identification if differences in the photographs led to a substantial likelihood of misidentification," "on the basis of some external characteristic, rather than on the basis of the defendant's looks." *Id*. at 305.

Defendant argues that the background color in his photograph was lighter than the background in the other photos. Insofar as we can determine from the poor-quality, black-and-white photos provided by defendant,[6] defendant is correct. However, it is only slightly lighter than

---

[3] We also note that the prosecutor never mentioned the use of facial-recognition software in his closing arguments.

[4] *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

[5] Supreme Court Administrative Order No. 2004-6, Standard 4.

[6] We requested either a good quality color copy or the physical exhibit itself, but defendant only produced what appears to be a color photograph of black-and-white photographs. We are unable to determine from the record whether the lineup was, in fact, actually conducted with black-and-white photographs.

the background in one of the other photos, and in any event, we are not persuaded that this is enough of a difference to render his photo improperly suggestive. See *Kurylczyk*, 443 Mich at 304 n 10. Defendant also argues that he is the only person in the photo array wearing earpods. This also appears to be accurate, but we do not think it is a detail that would be noticed without specifically looking for it, and in any event, there was no testimony that the person who robbed King wore earpods. Cf., *id*. at 305 (discussing a case in which "the defendant was the only man of thirteen men depicted in a photographic array who was wearing glasses," and "the witnesses admitted selecting the photograph on the basis of the glasses"). Finally, defendant notes that his photograph had a different aspect-ratio than the other photographs. This is again true, but King could not have known that until after she made her selection, because she viewed the array through an overlay that had nearly-identical square cutouts over each photo. Otherwise, all of the subjects in the array have similar appearances. They are all black males with short hair, and all appear to have short, goatee-style facial hair.

Furthermore, even if defendant's photograph was particularly distinctive,

a suggestive lineup is improper only if under the totality of the circumstances there is a substantial likelihood of misidentification. The relevant inquiry, therefore, is not whether the lineup photograph was suggestive, but whether it was unduly suggestive in light of all of the circumstances surrounding the identification. When examining the totality of the circumstances, courts look at a variety of factors to determine the likelihood of misidentification. Some of the relevant factors . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. [*Kurylczyk*, 443 Mich at 306 (citations and quotation omitted).]

In this case, King had ample opportunity to view defendant at the time of the crime. Importantly, she was already familiar with him because she had seen him at her house on a previous night and earlier that very same night. At the time of the crime, defendant had returned to her house with a bag of chips and went to the bathroom. Upon his return, he produced a gun and demanded money and items. It is not clear exactly how long this entire episode lasted inside the house, but King's testimony indicates that it took a significant amount of time. King explained that they walked upstairs to her bedroom to look for items, where they spent considerable time together while defendant directed King to wrap her legs in tape and tried to figure out how to disconnect King's DVR. There was also time spent grabbing shoes and coats downstairs before leaving the house. Thereafter, defendant spent time taking King to his car, driving her around the block, instructing her how to erase her phone, and letting her out. In sum, this was not a mere fleeting moment that King may have seen defendant, and although not stated outright, it is clear that defendant never wore a mask or otherwise concealed his face. Accordingly, this factor weighs heavily in favor of the identification not being unnecessarily suggestive.

Defendant argues that King's description of the robber was inaccurate and inconsistent. Officer Lariah Stevens, who took King's initial statement immediately after the robbery, had difficulty communicating with King because King was traumatized, scared, and shaking. King testified that, although she was shaken up from the incident, she told police officers immediately

afterward that the person who came to her house that night was wearing jogging pants. King also said that three days later, when she was calmer, she described the person as wearing black jeans. When confronted with this discrepancy, King explained that defendant was wearing jogging pants the first time he came over to her house that evening, but when he returned with the bag of chips later that night, he was wearing different clothing. The discrepancy therefore had some basis in reality and is not so blatantly implausible or inexplicable that it should be removed from the jury's consideration. See *People v Lemmon*, 456 Mich 625, 643-646; 576 NW2d 129 (1998).

Defendant also argues that King failed to mention defendant's tattoos during her initial talk with the police. However, there was conflicting testimony whether King initially told the police about defendant's tattoos, and it is not this Court's role to resolve conflicts in the evidence. *Nichol v Billot*, 406 Mich 284, 301-302; 279 NW2d 761 (1979). In any event, there is no evidence that King was specifically asked about tattoos, and a failure to mention that the robber had tattoos does not mean she explicitly said that the robber did *not* have tattoos. We are not persuaded that this argument has any merit.

Regarding the factor pertaining to "the length of time between the crime and the confrontation," the record shows that King's photo identification occurred 21 days after the commission of the crime. "Courts have held that delays as long as eighteen months after a crime do not invalidate an eyewitness identification." *Kurylczyk*, 443 Mich at 307-308. Therefore, the three-week delay in this case was not a significant amount of time and does not indicate suggestiveness. In conclusion, the totality of the circumstances does not show a likelihood of misidentification.

We therefore conclude that there would have been no basis for granting the requested *Wade* hearing even if defense counsel had not withdrawn the request. As noted, counsel cannot be ineffective for failing to undertake a futile gesture. *Ericksen*, 288 Mich App at 201. Additionally, when defense counsel withdrew the request for a *Wade* hearing, counsel indicated that the decision was made after talking with defendant about the motion, and defendant admitted in court that he agreed with the decision. "[I]n general, an appellant may not benefit from an alleged error that the appellant contributed to by plan or negligence." *People v Witherspoon*, 257 Mich App 329, 333; 670 NW2d 434 (2003). The trial court rejected defendant's request for a new trial on the basis of defendant's personal agreement on the record that the motion should be withdrawn. The trial court did not obviously err by doing so, and defendant fails to challenge the trial court's reasoning. See *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). For all of the above reasons, we reject defendant's contentions that he received ineffective assistance of counsel when trial counsel withdrew the request for a *Wade* hearing and that King's identification of defendant should have been excluded from evidence.

## C. DNA TESTING OF ROBE

Defendant also contends that trial counsel was ineffective for not requesting that the robe recovered from his house be tested for DNA. Defendant cannot succeed on this claim for the simple reason that there is no evidence to show that any testing would have been favorable to

defendant.[7]  In other words, defendant cannot show that there is a reasonable probability that the result of his trial would have been different had DNA testing taken place.  Moreover, King positively identified the robe recovered from defendant's residence as her robe on the basis of the particular stains on the robe, some of which were from her makeup.  Therefore, defendant has not overcome the presumption that counsel reasonably decided not to pursue DNA testing of the robe as a matter of strategy.  DNA testing very well might have shown that the stains King identified were from her, which would have eliminated the last vestiges of doubt regarding defendant's guilt.

### III.  GREAT WEIGHT OF THE EVIDENCE

Defendant argues that he is entitled to a new trial because the jury verdicts are against the great weight of evidence.  We disagree.

This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion.  *Lemmon*, 456 Mich at 648 n 27; see also *People v Stiller*, 242 Mich App 38, 49; 617 NW2d 697 (2000).  A court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes.  *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

As explained in *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009):

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand.  Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence.  [Citations omitted.]

Defendant maintains that the verdicts are against the great weight of evidence because King's testimony was not credible.  As discussed, testimony may not be removed from the jury's consideration unless it is physically or effectively impossible, or it was impeached to such an extreme degree that it could not have had any remaining probative value.  *Lemmon*, 456 Mich at 642-646.

Defendant's characterization that King's testimony was "patently incredible" is belied by the record.  Nothing in her testimony was patently false.  Defendant relies on the prosecutor's curious tact during closing argument, where he stated:

> Now, let me start off with a simple concession and it will get to the heart of what I believe [defense counsel] is going to tell you.  If the only evidence in this case was [King's] testimony, you absolutely would have reasonable doubt.  She missed a lot of details, sometimes they conflicted.  She said she had short term

---

[7] Defendant tacitly acknowledges this in his brief on appeal when he states that "DNA testing *could potentially* provide exculpatory or impeachment evidence for Mr. Moore."  (Emphasis added.)

memory loss. Her testimony alone would give you ample doubt about what may or may not have happened, including most importantly the identify of Mr. Dominique Moore. Her testimony alone had some difficulties.

* * *

Now, before I go on let [sic] just state, again, her testimony alone would give you ample reasonable doubt.

However, the prosecutor went on to argue that the remainder of the evidence filled any "holes" in King's testimony. Defense counsel seized on this "concession" during his closing argument to contend that King was unreliable, but in rebuttal, the prosecutor attempted to clarify that he was not suggesting that King was "inherently unreliable," such that the jury could not believe what she was saying. Instead, he explained that there was doubt in King's "initial statements," which might make the jury think "oh, I don't know."

The trial court correctly instructed the jury that statements by the attorneys, necessarily including the prosecutor's supposed concession during closing argument, are not evidence and that the jury should only consider evidence when deciding the case. See *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). Furthermore, even stipulations are not binding on the jury. See *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998). Indeed, defense counsel acknowledged in his closing argument that the jury did not have to accept the prosecution's so-called concession. Evaluating the credibility of witnesses is the sole province of the jury. *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013). Even where the applicable standard of review is de novo, we still defer to the trier of fact's superior ability to evaluate the credibility of witnesses. *In re Loyd*, 424 Mich 514, 535; 384 NW2d 9 (1986).

After reviewing the lower court record, we do not agree with defendant's position that King's testimony was patently incredible. Defendant relies on cell-tower evidence that showed defendant's phone moving generally in an *easterly* direction from 12:26 a.m. until 12:36 a.m. Defendant argues that this irreconcilably conflicts with King's testimony that defendant drove her north and then west before releasing her from his vehicle. It is true that a witness's testimony might be rendered incredible if "blatantly" contradicted by objective and clear evidence. See *Scott v Harris*, 550 US 372, 378-381; 127 S Ct 1769; 167 L Ed 2d 686 (2007). However, defendant only drove King "just around the block," and the evidence indicated that cell-tower data could not reliably track such short distances. Furthermore, the exact time of the robbery itself was unclear, leaving open the possibility that the easterly movement occurred after King was released. For the same reason, defendant's contention that the cell-tower data showed that he was making calls to King during the robbery is merely plausible, not conclusively proven. King's testimony is therefore not so implausible that it could not be believed by the jury. See *Lemmon*, 456 Mich at 643-646.

Defendant also argues that other cell-tower data simply preponderates against the verdict. He claims that he lived in the vicinity of "the" cell tower that his phone pinged. There was data from several cell towers admitted into evidence. Defendant does not describe which specific tower he is referencing. In any event, there was no testimony that the same cell tower that defendant would utilize from his home would be the same tower located near King's home, so defendant's

position is not supported by the evidence. Defendant also argues that the cell-tower evidence was merely circumstantial. Even if that was true, it is well established that a defendant's guilt can be proved through circumstantial evidence. *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019). In any event, there was more than circumstantial evidence, because King provided direct evidence of defendant's guilt when she identified him as the person who robbed her.

In sum, the evidence does not preponderate so heavily against the jury's verdicts that it would be a miscarriage of justice to allow the verdicts to stand. To the extent that King's testimony was impeached, it was not deprived of all probative value.

## IV. MOTION FOR MISTRIAL

Defendant also argues that the trial court erred when it denied his motion for a mistrial based on his affirmative response when arresting police officers asked him if there were any guns in his house. We disagree.

"A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003) (quotation and alteration omitted). For purposes of resolving this appeal, we presume, without deciding, that the police officer's questioning of defendant regarding guns in the house was a violation of *Miranda* and, given that defendant was secured in a police vehicle, did not fall within the public-safety exception to *Miranda*. See *People v Attebury*, 463 Mich 662, 668-672; 624 NW2d 912 (2001). Nevertheless, a violation of *Miranda* is not, by itself, a violation of the constitution. *People v Kusowski*, 403 Mich 653, 661; 272 NW2d 503 (1978). "If [a] custodial interrogation is not preceded by an adequate warning, statements made during the custodial interrogation may not be introduced into evidence at the accused's criminal trial." *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013). However, the exclusionary rule is subject to numerous exceptions and does not extend to "[p]hysical evidence obtained as a result of an unwarned statement" unless that statement was actually involuntary. *People v Campbell*, 329 Mich App 185, 204-205; 942 NW2d 51 (2019). It is clear that defendant's response to the police officer's question was not coerced, so even presuming defendant's statement was inadmissible, the shotgun found by the police would have remained admissible.

In other words, defendant presents, at most, an evidentiary error. There are circumstances under which evidentiary errors might warrant a mistrial, such as an expert vouching for a sexual assault complainant in a case that is a pure credibility contest. See *People v Uribe*, 508 Mich 898, 899-900; 962 NW2d 644 (2021). However, that situation was described as "far more pernicious than a mere evidentiary error." *Id.* (quotation omitted). In contrast, a mistrial is not necessarily mandated by a reference to a defendant taking a lie detector test. *People v Ortiz-Kehoe*, 237 Mich App 508, 514; 603 NW2d 802 (1999). An important consideration is, again, whether the case amounted to a credibility contest that might have been resolved on the basis of the improperly-admitted evidence. See *People v Yatooma*, 85 Mich App 236, 241; 271 NW2d 184 (1978). Because the shotgun itself would have been admissible, and because King indicated that the robbery was effectuated with a handgun rather than a shotgun, it is extremely unlikely that the admission of defendant's unwarned statement had any effect on the outcome of the trial. It is axiomatic that a harmless error would not warrant a mistrial, so the trial court did not err by denying the motion for a mistrial.

## V. PROSECUTORIAL MISCONDUCT

Defendant argues that he is entitled to a new trial because the prosecutor impermissibly impugned defense counsel. We disagree.

Defendant acknowledges that he did not object to the challenged comments. Therefore, this issue is unpreserved and is reviewed for plain error affecting substantial rights. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). "We review claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *Id.* "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Rodriguez,* 251 Mich App 10, 30; 650 NW2d 96 (2002). "Appellate review of allegedly improper conduct is precluded if the defendant fails to timely and specifically object, unless an objection could not have cured the error or a failure to review the issue would result in a miscarriage of justice." *Id.*

At the start of his rebuttal argument, the prosecutor stated:

> Moments like this remind me of the second year of law school trial advocacy. They have an old adage, an old phrase that goes back decades and decades. If the law is on your side, argue the law. If the facts are on your side, argue the facts. If the law and the facts are not on your side, confuse the jury.

> I told you during voir dire [defense counsel] is a great attorney. He is and I can tell you personally he's a good man. And I sympathize for the position that he is in trying to tell you that there's reasonable doubt in this case.

Defendant takes exception to the prosecutor's comment that neither the facts nor the law was on defendant's side, which meant that defense counsel was attempting to confuse the jury. It is improper for a prosecutor to suggest that defense counsel is trying to distract the jury from the truth. *Unger*, 278 Mich App at 238. Indeed, on appeal, the people concede that "the prosecutor was wrong to say that the defense attorney was trying to confuse the jury." However, "an otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *Watson*, 245 Mich App at 593 (quotation marks and citation omitted). Here, the prosecutor went on to explain how defense counsel's argument, which relied on the cell-tower data discrepancies, was undermined by the fact that it was not known precisely when the robbery occurred and by the presence of King's robe in defendant's house. Given that the prosecutor was responding to defense counsel's arguments and offered explanations for counsel's arguments that were grounded in the evidence, the prosecutor's comments were not egregiously inappropriate.

Moreover, even if the comment did cross the line of permissible behavior, defendant is not entitled to any relief. The one statement about attempting to "confuse the jury" was isolated and any prejudicial effect from that statement could have been cured with a timely objection and curative instruction. Indeed, we note that the jury was instructed that it was to only consider the admitted evidence and that the attorneys' arguments are not evidence. Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Accordingly, defendant has failed to show how the prosecutor's comment deprived him of a fair trial.[8]

## VI. DOUBLE JEOPARDY

Defendant argues that his multiple convictions of armed robbery, AWIRWA, and felonious assault violate the constitutional protection against double jeopardy. We agree only to the extent that his conviction for armed robbery precludes him from being convicted of AWIRWA.

The United States and Michigan constitutions both protect defendants against "multiple prosecutions and multiple punishments for the same offense," in order "to prevent a court from imposing a sentence greater than that intended by the Legislature." *People v Baker*, 288 Mich App 378, 380-381; 792 NW2d 420 (2010). Multiple punishments are permitted where the Legislature clearly intended to impose such multiple punishments; in the absence of a clearly expressed intention, Michigan courts use the *Blockburger*[9] "same elements" test to determine whether multiple punishments may be imposed. *People v Smith*, 478 Mich 292, 316; 733 NW2d 351 (2007). The *Blockburger* test examines whether each of the criminal statutes "requires proof of a fact which the other does not," and "conviction of both offenses is precluded only where it is impossible to commit the greater offense without first having committed the lesser offense." *Id*. at 311 (quotation omitted). Nevertheless, "the *Blockburger* test is a tool to be used to ascertain legislative intent," so the focus must be kept on "the statutory elements, not the particular facts of the case." *People v Ream*, 481 Mich 223, 238; 750 NW2d 536 (2008).

This Court has established that "assault with intent to rob while armed is a lesser included offense of armed robbery and neither crime contains an element the other does not," so a defendant may not be "convicted of both." *People v Gibbs*, 299 Mich App 473, 489-491; 830 NW2d 821 (2013). Therefore, defendant's AWIRWA conviction must be vacated. *Id*. Additionally, because one of defendant's felony-firearm convictions has as its predicate offense the conviction of AWIRWA, we vacate that felony-firearm conviction as well.

Conversely, this Court has determined that armed robbery and felonious assault each require proof of an element that the other does not, so a defendant may be convicted and sentenced for both. *People v Chambers*, 277 Mich App 1, 8-9; 742 NW2d 610 (2007). Defendant relies on an older case in which this Court held that armed robbery and felonious assault do implicate double jeopardy. *People v Yarbrough*, 107 Mich App 332, 336; 309 NW2d 602 (1981). Although *Yarbrough* has not been formally overturned, this Court has explained that *Yarbrough* is obsolete because it predates our Supreme Court's adoption of the *Blockburger* test and subsequent statutory amendments. *Chambers*, 277 Mich App at 9 n 9. Furthermore, although *Yarbrough* is precedential

---

[8] For similar reasons, defendant's claim that trial counsel was ineffective by failing to object to the comment also fails. Had counsel objected, it would have, at best, resulted in a curative instruction. Given the nature of the prosecutor's comment, the absence of a curative instruction coupled with the general instruction the trial court did provide did not have a reasonable probability of affecting the outcome of the trial. See *Trakhtenberg*, 493 Mich at 51.

[9] *Blockburger v United States*, 284 US 299; 52 S Ct 180; 76 L Ed 306 (1932).

under the doctrine of stare decisis, MCR 7.215(C)(2), it was decided prior to November 1, 1990, and therefore is not binding on us, MCR 7.215(J)(1). We are required to follow *Chambers*. *Id*. Defendant's convictions of armed robbery and felonious assault do not violate double jeopardy.

## VII. SCORING OF OFFENSE VARIABLE 13

Defendant argues that the trial court erred by scoring offense variable (OV) 13 at 25 points. We disagree.

We review for clear error a trial court's factual determinations underlying a scoring decision, and we review de novo whether the trial court's factual findings justify the scoring decision. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). The trial court's factual determinations "must be supported by a preponderance of the evidence." *Id*. OV 13 addresses a defendant's continuing pattern of criminal behavior. MCL 777.43(1). Relevant to this case, 25 points are properly scored for this OV if "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(c). As defendant concedes, even after vacating his AWIRWA conviction, he was convicted of at least three crimes against a person: armed robbery, felonious assault, and unlawful imprisonment. He argues that they cannot constitute a "pattern" because they purportedly all arose from the same occurrence.

This Court has already considered and rejected defendant's argument, holding that "there is nothing in the language of MCL 777.43(1)(c) to support [the] argument that multiple convictions arising from the same incident cannot be considered for scoring OV 13." *Gibbs*, 299 Mich App at 487. As defendant points out, this Court has also held that a single *act* cannot constitute a pattern for purposes of OV 13. *People v Carll*, 322 Mich App 690, 704; 915 NW2d 387 (2018). Importantly, however, *Carll* distinguished between an act and an episode, noting that a single criminal episode could include a multitude of distinct criminal acts, each of which could be considered together as a pattern. *Id*. at 705. In *Carll*, the defendant committed a single criminal act of running a stop sign, which caused the death of one person and serious injuries to three other people. *Id*. at 693-694. In contrast, defendant committed several discrete criminal acts: he threatened King with a firearm, he committed robbery against King, and he unlawfully imprisoned and transported King in his vehicle at gunpoint. It is irrelevant whether they occurred as part of a single episode, because they are individually distinct and identifiable actions. OV 13 was properly scored at 25 points.

## VIII. SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues in his Standard 4 brief that there was insufficient evidence to support his convictions. We disagree.

A challenge to the sufficiency of the evidence is reviewed de novo by viewing the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v Evans*, 335 Mich App 76, 85; 966 NW2d 402 (2020). "This standard of review is deferential. We must draw all reasonable inferences and make credibility determinations in favor of the verdict." *Id*. The inquiry is not what credence should be given to any of the evidence, but rather whether there was "sufficient evidence, *if believed*, to support the judgment." *People v Beck*, 17 Mich App 659, 660;

170 NW2d 266 (1969) (emphasis added).  The jury may not speculate.  *People v Bailey*, 451 Mich 657, 673-675, 681-682; 549 NW2d 325 (1996).  However, the jury may pick and choose what evidence to believe or disbelieve, unless there is "a total want of evidence upon any essential point."  *People v Howard*, 50 Mich 239, 242-243; 15 NW 101 (1883).  Defendant's argument relies on criticizing King's credibility, an argument we have already rejected and, in any event, that is inappropriate when challenging the sufficiency of the evidence.  *Evans*, 335 Mich App at 86-88.  The evidence, if believed by the jury, was sufficient to support defendant's convictions.

We vacate defendant's convictions of AWIRWA and the accompanying felony-firearm conviction.  In all other respects, we affirm.

/s/ Amy Ronayne Krause
/s/ Kathleen Jansen
/s/ Christopher M. Murray